IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RICARDO CURTIS LOPEZ and<br>CHRISTOPHER MICHAEL DEAN,<br><br>Defendants. | CRIMINAL ACTION FILE<br>NO. 4:04-CR-72-HLM |

**NON-FINAL REPORT & RECOMMENDATION**

Before the Court are Motions to Suppress Evidence [35, 49] and Motions for Jackson-Denno Hearings [48, 50] filed by defendants, Ricardo Curtis Lopez and Christopher Michael Dean. In response to said Motions, the Court conducted an evidentiary hearing on November 8, 2005, which has been transcribed [56] ("Tr."). On the basis of the evidence received at that hearing, the undersigned **REPORTS** that police officers properly entered defendants' residence without a warrant, given the existence of exigent circumstances. Therefore, the undersigned **RECOMMENDS** that defendants' Motions to Suppress Evidence [35, 49] be **DENIED**.

AO 72A
(Rev.8/82)

Furthermore, because evidence received at that hearing shows that defendants voluntarily made incriminating statements to law enforcement after having been advised of their Miranda rights (see infra Parts I.D and I.E), counsel for defendants orally informed the Court that they were withdrawing their Jackson-Denno Motions. Accordingly, defendants abandoned these Motions and did not address this issue in their joint brief [58]. Therefore, the Clerk is **DIRECTED** to **TERMINATE** those Motions [48, 50].

# I. Statement of Facts

## A. Events at the Oak Villa Apartments

On the morning of September 10, 2004, Deputy Rodney Clemones of the Floyd County Sheriff's Department was patrolling in the Coosa area of the county when he received a call informing him that the AmSouth Bank on U.S. Highway 27 North had been robbed. Tr. 2-3. As he traveled from west Rome to the Armuchee area, Deputy Clemones received a radio report to be on the lookout for a silver Ford Taurus bearing a "drive-out" tag[1] that was believed to be the "getaway" vehicle. Id. at 3. When he arrived in the area, Deputy Clemones began combing the side streets

[1] A "drive-out" tag is a paper or plastic tag affixed to vehicles by automobile dealers. Tr. 4.

AO 72A
(Rev.8/82)

and places where a car could have been ditched, such as parking lots of apartment complexes and motels. Id. Deputy Clemones noticed a car matching the above description at the end of the parking lot for the Oak Villa Apartments,[2] which are located off Old Summerville Road. Id. at 4-5. The time was approximately 11:06 a.m. Id. at 9, 11, 21-22.

As the Deputy pulled his car into that lot, he observed a white male walking toward the Taurus. Tr. 5, 13. After he turned his patrol car around and headed out the way he had come in, Deputy Clemones noticed that the white male had walked closer to that vehicle. Id. at 5, 13. The Deputy testified that this man walked around to the front of the Taurus to one of its doors,[3] looked in the window, tried to open the door, and then noticed that he was being watched. Id. at 6, 13-14. The man was holding a small, white rag in his hands. Id. at 6, 16.[4]

---

[2] The car's position in the parking lot was about 100 yards from Old Summerville Road. Tr. 5. Deputy Clemones testified that, when he inspected the vehicle closer, he noticed that it had no tag. Id. at 12.

[3] Deputy Clemones testified on direct that the man went to the driver's side door, but on cross-examination testified that he went instead to the passenger's side door. Compare Tr. 6 with Tr. 14.

[4] Deputy Clemones testified that the rag, about the size of a wash cloth, bore no evidence of the dye often placed in money bags by tellers to foil bank robbers. Tr. 16. There were also no telltale dye marks on either Mr. Dean's clothes or skin. Id.

AO 72A
(Rev.8/82)

Deputy Clemones pulled up beside the Taurus and got out. By this time, the white male had moved away from the vehicle to a nearby basketball court. Tr. 6, 14. The Deputy approached the man, asked him to come over, and requested his name. Id. at 6, 15. The man identified himself as Christopher Michael Dean. Id. He did not try to flee or make any threatening moves. Id. at 15. The Deputy smelled no alcohol on him. Id. The Deputy asked Mr. Dean what he was doing over by the vehicle. Id. at 6, 16. Mr. Dean replied that it was a nice car and he was just "checking it out." Id.

When Deputy Clemones asked Mr. Dean what he was doing in the area, he indicated that he was going to play basketball. Tr. 8, 17. However, he had no basketball with him (and a subsequent search did not locate one). Id. This response aroused the Deputy's suspicions. Id. Deputy Clemones notified dispatch that he had located a car matching the description of the getaway car and requested that the VIN be checked. Tr. 6-7. That check revealed that the vehicle had been stolen from a car lot the prior day. Id. at 7.

The Deputy then asked Mr. Dean where he lived. He provided an address, which was across the street at the Hidden Glen Duplexes. Tr. 6, 17-18, 19. Captain Mike Brock with the Floyd County Police Department was the first to arrive on the

AO 72A
(Rev.8/82)

scene to assist. Id. at 7, 18. Deputy Clemones advised Captain Brock of Mr. Dean's address and suggested that officers secure it or stand by there until more information could be obtained. Id. at 7, 9, 18.

Captain Brock directed officers who arrived next at the scene to go to the Hidden Glen Duplexes. Deputy Clemones stayed in the parking lot with Mr. Dean. Tr. 8, 18, 66-67. Although Mr. Dean was not then under arrest, he was not free to leave. Id. at 18. Given that the Taurus was stolen, had no tag, and may have been used in a robbery, given Mr. Dean's actions in looking in the vehicle, and given his assertion that he was going to play basketball with no ball, Deputy Clemones believed that he had enough to detain him. Id. at 18-19. However, once subsequent events occurred at his residence (described below), Deputy Clemones arrested Mr. Dean. Id. at 7-8, 9, 18. After he placed Mr. Dean in the patrol car and a wrecker removed the Taurus, Deputy Clemones pulled his vehicle across the street to the Hidden Glen Duplexes. Id. at 9-10, 20. Thereafter, he delivered Mr. Dean to the Floyd County Police Department. Id. at 11-12.

**B. Events at the Hidden Glen Duplexes**

In response to the information obtained by Deputy Clemones, Sergeant George Lemming, Patrolman Jesse Adams, and Patrolman Dale Johnson met at the entrance

AO 72A
(Rev.8/82)

of the Oak Villa Apartments. Tr. 25, 67. As noted above, Captain Brock directed these officers to go across the street to an address in the Hidden Glen Duplexes and secure the area. Id. at 25-27, 67-68. Patrolman Adams went to the front of the duplex in question, while Patrolman Johnson went to the rear. Id. at 27, 34, 68.[5] As he approached, Patrolman Johnson noticed someone running through the duplex. Id. at 29, 68. The Government points out that there were no obstructions between Mr. Dean's duplex and the location where officers encountered him. Thus, it is reasonable to assume that anyone in the duplex could see both the police cars surrounding it and the officers with Mr. Dean. Gov't Br. [59] at 4.

As Patrolman Adams drew near the front window, he noticed that it was open[6] and a light was on inside. Id. at 27. As he looked into the living room through that window,[7] Patrolman Adams spotted a large amount of money on top of a television

---

[5] The two units in the duplex were side-by-side. The one connected to Mr. Dean was to the right. Tr. 33, 69.

[6] By use of the word "open," Patrolman Adams did not mean that the window was actually open; instead, he meant that no blinds or curtains prevented one from seeing into the duplex through the window. Tr. 35-36. In fact, none of the windows in the duplex was open. Id. at 46.

[7] Sergeant Lemming testified that the front window was two or three feet to the right of the front door. Tr. 69. If one stood four feet away from the front door, one could see in the living room window. Id.

AO 72A (Rev.8/82)

situated next to that window. Id. at 27-28, 38, 80. The money was in a stack about the size of a football and still had bands wrapped around it. Id. at 28, 36-37, 71, 79. Patrolman Adams notified dispatch of what he had seen. In response, other officers came to the duplex. Sergeant Lemming looked in the window and also saw the money. Id. at 28, 37, 69, 79. He then directed Patrolman Adams to go to his vehicle (located at the rear of the duplex) and obtain another weapon. Id. at 28, 36-37, 69-70.[8] As he did so, Sergeant Lemming kept watch on the building. Id. at 36. When Patrolman Adams returned, Sergeant Lemming asked him to look in the window and see if the money was still there. Id. at 28, 38, 70. As Sergeant Lemming watched the front door, Patrolman Adams looked in the window, but the money was gone except for a single five-dollar bill. Id. at 29, 38, 70, 71-72.

Sergeant Lemming radioed Captain Brock and told him that some money had been seen inside the duplex, but it was now gone. Tr. 70, 72. As the officers were contemplating their next move, Patrolman Adams thought he smelled something and said, "'George, you smell that?'" or "You smell something burning?'" Tr. 29, 39,

[8] The officers likely sought more firepower because they knew that the robber had discharged a firearm at the AmSouth Bank. If the person spotted in the duplex was the robber, then he might be armed and dangerous.

AO 72A
(Rev.8/82)

70, 84.[9] According to Patrolman Adams, Sergeant Lemming replied that it smelled like something was burning. Id. at 29.[10] Sergeant Lemming, who feared that evidence was being destroyed, called Captain Brock, advised him of the circumstances, and received instructions to go in and secure the residence. Id. at 29-30, 39, 41-42, 70, 72, 82, 84, 102. Sergeant Lemming forced the door open, allowing Patrolman Adams, Deputy David Hightower, and Sergeant Mark Tison to enter the duplex. Id. at 30, 46, 72, 80. When they entered the living room, they encountered no smoke, the room did not smell like smoke, they saw nothing burning, and they saw no ashes. Id. at 43-44, 73, 80.

Patrolman Adams secured the living room, while the other officers secured the other areas of the one-story duplex. Tr. 30-31, 44, 46, 80-81.[11] From one of the

---

[9] Patrolman Adams testified that he saw no smoke; he simply smelled smoke. Tr. 39-40. However, it was not cigarette or marijuana smoke or the smell of burning plastic. Id. at 40-41.

[10] However, during his direct testimony, Sergeant Lemming testified that he did not smell anything where he was standing but that Patrolman Adams smelled something where he was standing. Tr. 70, 78. These officers were six to eight feet apart. Id. at 70. At the time Patrolman Adams detected the odor, he was in front of the window. Sergeant Lemming was facing the door. Id.

[11] One enters the living room of the duplex through the front door. Tr. 30. The kitchen is located immediately behind the living room, with two bedrooms located to the right, one to the front and one to the rear. Id. at 30-31, 43, 106.

AO 72A
(Rev.8/82)

bedrooms, Patrolman Adams heard someone say, "'Let me see your hands.'" Id. at 31. Subsequently, the other officers removed a man (later identified as Ricardo Curtis Lopez) from the bedroom, and Patrolman Adams secured him in the living room. Id. at 31, 46-47, 72-73, 82. Sergeant Lemming then advised Mr. Lopez of his Miranda rights. Id. at 31, 50, 73, 74, 83, 89-90. Although Mr. Lopez was belligerent and kept telling the officers that what they were doing was wrong because he had committed no crime, he seemed to understand what Sergeant Lemming was telling him. Id. at 74, 86. Moreover, Mr. Lopez did not smell of alcohol or appear to be under the influence of drugs. He responded sensibly to what Sergeant Lemming was saying to him. Id. at 74. When advising Mr. Lopez of his rights, Sergeant Lemming made no threats or promises to him. Id. at 75.

These officers did not question Mr. Lopez or take any statements from him. Tr. 31-32, 75, 82-83, 84. As they placed him in the patrol car, Patrolman Adams testified that Mr. Lopez was very agitated and upset and made some statements, including the assertion that he should have "shot it out" with the officers (or words to that effect). Id. at 32-33, 49-50.[12]

[12] In contrast, Sergeant Lemming testified that Mr. Lopez made the statement about "shooting it out" later in the day when they were searching the area around the CCC Road. Tr. 85-86; see infra note 13.

AO 72A
(Rev.8/82)

The officers only conducted a cursory search of the duplex in areas where someone could hide and did not conduct a thorough search for any evidence of a bank robbery. Tr. 73, 83, 104-05. Sergeant Lemming testified that the officers were in the duplex for only about one minute. Id. at 83, 85. Thus, later that day, a federal warrant authorizing a search was delivered to the duplex. Id. at 32, 75, 85-87.[13]

**C. The Search of the Duplex**

During the afternoon of November 10, FBI Special Agent (hereafter "SA") Peter J. Connelly led a team that executed a federal warrant authorizing the search of the duplex. Tr. 93.[14] SA Connelly's team located a .22 caliber pistol under Mr.

---

[13] Late in the afternoon of November 10, officers joined Mr. Lopez on the CCC Road on the property of Berry College to search for money that he had said was hidden there. Tr. 75-76, 84, 98. The duplex in question was located about 600 yards from this road. Id. at 76. However, the search located nothing. Id. at 77, 84, 113. Mr. Lopez speculated to FBI agents either that he was confused about where he had hidden the money and dye pack or that his roommate, defendant Dean, had followed him into the wooded area and had taken those items. Id. at 100-01, 103-04, 109-10. Some of the officers speculated, however, that Mr. Lopez had taken them on a "merry little walk-about in the woods." Id. at 113.

[14] While the FBI was in the process of obtaining that search warrant, Agent Connelly learned from FBI SA Chuck Reed that Mr. Lopez had agreed to cooperate and that he was willing to allow a consent search of the duplex. Tr. 94-95, 116. Officers brought Mr. Lopez into the duplex from the patrol car where he had been held. Id. at 95. SA Connelly then discussed a consent search with Mr. Lopez and asked him to sign a form authorizing it. Id. He initially agreed to sign the form. However, he became upset because he believed that officers had disheveled his

AO 72A (Rev.8/82)

Lopez's bed. Id. at 98-99.[15] They also found a box of 100 .22 caliber cartridges, nine of which were missing. Two cartridges were found on the floor, along with a spent .22 caliber shell casing. SA Chuck Reed, who was interviewing Mr. Lopez at the Floyd Count Jail, was in contact with SA Connelly during the search. SA Reed relayed information provided by Mr. Lopez to SA Connelly. Id. at 99, 119. This process led agents to Mr. Lopez's bedroom closet,[16] where they found a wad of currency totaling $1,037 inside the pocket of a pair of trousers. Id. at 99-101, 106-07, 110-11.[17] The money was not stained by dye. Id. at 100. SA Connelly testified that their search revealed nothing to indicate that someone in the duplex had

---

bedroom when they arrested him. Id. at 95, 101, 115-16. He also believed that the officers who arrested him had already searched his residence. Id. at 101. Because SA Connelly did not want the officers endangered by an unsecured weapon, he asked Mr. Lopez where the firearm that had been used in the bank robbery was located. He replied that it was under his bed. Id. at 95. However, Mr. Lopez then refused to sign the consent form, at which time SA Connelly directed that he be placed back in the patrol car. Id. at 95-98. The officers and agents then waited for the search warrant to arrive before beginning their search. Id. at 96, 98.

[15] The serial number had been ground off the pistol. There was a round of ammunition in the chamber. Tr. 99.

[16] SA Connelly believed that these items had been found in Mr. Lopez's bedroom because his driver's license and some of his personal items were also found there. Tr. 106.

[17] About $3,300 had been stolen from AmSouth Bank. Tr. 100.

AO 72A
(Rev.8/82)

attempted to destroy evidence by fire. Id. at 102. He added that he did not smell smoke in the duplex. Id. at 103. Later examination of the cash revealed one twenty-dollar bill with a burnt left upper corner. Id. at 100, 102-03.[18]

**D. Questioning of Defendant Lopez by FBI Agents**

**1. Questioning By SA Reed**

Officers transported Mr. Lopez to the Floyd County Jail. About forty-five minutes after he had refused the consent search of his duplex, SA Reed met with him in a jail conference room. Tr. 116-17. They sat at a table in a large, well-lit room. Mr. Lopez was not handcuffed. Id. at 117. Also present were two members of the Floyd County Police Department. Id. SA Reed advised Mr. Lopez who he was, displayed his credentials, and explained that he was there to discuss the bank robbery that had occurred earlier that day. Id. at 117-18. After Mr. Lopez indicated that he understood the purpose of their meeting, SA Reed provided him with a copy of the FBI's advice of rights form and read it to him as Mr. Lopez read along. SA Reed had Mr. Lopez read aloud the waiver statement at the bottom of the form. Mr. Lopez then signed the form. Id. at 118. SA Reed testified that he did not threaten Mr.

[18] It is unlikely that the burnt corner of a single bill could have generated the smell detected by Patrolman Adams.

AO 72A
(Rev.8/82)

Lopez in any way or make any promises to him. Id. Mr. Lopez did not appear to be under the influence of any drugs or alcohol. Id. He responded sensibly to all questions that were asked. Id.

After Mr. Lopez signed the waiver (in evidence as Gov't Ex. 1), SA Reed began asking him questions. Tr. 119. He incriminated himself with regard to the robbery of the AmSouth Bank. Id. He described how he had robbed the bank and that he had accidently discharged his pistol while taking money from one of the teller's drawers. Id. at 120, 125. SA Reed asked for, and Mr. Lopez provided, information about where items related to the bank robbery might be found in the duplex. SA Reed then relayed that information to SA Connelly. Id. at 120. (As previously discussed, this information led to the discovery of incriminating evidence in the duplex.) Mr. Lopez added that his roommate, Mr. Dean, was not involved in the robbery. Id. at 131.

**2. Questioning By SA Meadows**

SA Robert Meadows testified that he was coordinating from his office the federal response to the AmSouth Bank robbery. Tr. 51-52. During earlier questioning at the Floyd County Jail, Mr. Lopez revealed that he had robbed the bank because he owed money to methamphetamine dealers. Id. at 52, 59-60.

AO 72A
(Rev.8/82)

Because officers believed that the information Mr. Lopez was providing about that criminal activity was relevant to a federal drug trafficking investigation, they arranged for SA Meadows to interview Mr. Lopez. Id. at 52, 58. Floyd County officers drove Mr. Lopez over to SA Meadows's office, located in the federal building in Rome, Georgia, late in the afternoon on November 10, 2004. Id. at 52, 57.

SA Meadows introduced himself to Mr. Lopez, discussed his rights, noted that he had waived his rights earlier at the Floyd County Jail, and then displayed to him a new waiver of rights form. Tr. 52-53, 54-55, 59. SA Meadows went through the information contained on that form with Mr. Lopez. Id. at 52-53; Gov't Ex. 2. SA Meadows asked Mr. Lopez if he could read and write, and then read each right listed on the form to him. Tr. 55. SA Meadows also read the waiver of rights portion of the form, and asked Mr. Lopez if he understood it and wanted to talk or continue to talk. Id. Mr. Lopez replied that he did. Id. SA Meadows then asked Mr. Lopez to sign the form, which he did. Id. SA Meadows and two Floyd County Police officers witnessed the signature. Id. At no time did SA Meadows threaten Mr. Lopez or imply that bad things would happen to him if he refused to talk. Id. Further, SA Meadows made no promises to Mr. Lopez or promised that any benefits would flow

AO 72A
(Rev.8/82)

to him if he waived his rights and talked. Id. at 55-56, 57. According to SA Meadows, Mr. Lopez understood what he was being said to him. Id. at 56. He did not smell of alcohol or appear to be under the influence of drugs. Id. He also had no questions about his rights before waiving them. Id.

Once he waived his rights, Mr. Lopez talked to SA Meadows and made incriminating statements about his drug trafficking. Tr. 56. Mr. Lopez also drove around with SA Meadows, pointing out locations in Floyd County where he had assisted in the distribution of methamphetamine. Id. at 52, 57.[19] Among those locations was a house on Clark Street in Rome. Mr. Lopez reported that the drug debt he owed the individual who lived in that house led him to rob the AmSouth Bank. Id. at 52, 59. However, Mr. Lopez did not talk to SA Meadows about events inside the bank that morning. Id. at 59.

**E. Questioning of Defendant Dean by FBI Agents**

While at the duplex on November 10, SA Reed and SA Connelly attempted to question defendant Dean, but he had exercised his rights and refused to talk. Tr. 94, 105, 121. Later that day, after Mr. Dean had been transported to the Floyd

[19] As they drove around, Mr. Lopez asked if his family would be safe if he talked. SA Meadows explained that the Government would not allow harm to come to his family because of something he said or because of his cooperation. Tr. 57-58.

AO 72A
(Rev.8/82)

County Jail, SA Reed again attempted to question Mr. Dean, but with the same result. Id. at 121. Several months later, however, Mr. Dean's counsel contacted the FBI and indicated that his client wanted to talk about his involvement in the bank robbery. Id. at 121-22.

On April 27, 2005, SA Reed and SA Connelly interviewed defendant Dean at a conference room at the Floyd County Jail in the presence of his attorney. Tr. 106, 121-22. SA Connelly introduced himself and told Mr. Dean that he and SA Reed were there to elicit information about the bank robbery on November 10 of the previous year. Id. at 122. SA Reed presented Mr. Dean with an advice of rights form, which they read together. Thereafter, Mr. Dean signed the waiver form (in evidence as Gov't Ex. 3). Id. at 122-23. According to SA Reed, Mr. Dean did not appear to be under the influence of any drugs or alcohol and responded sensibly to all questions. Id. The FBI agents neither threatened Mr. Dean nor promised him any benefits. Id. at 123. Mr. Dean's attorney was present during the entire interview. Id. Subsequently, Mr. Dean answered questions about the bank robbery and incriminated himself but exculpated Mr. Lopez. Id. at 123-24, 128, 130.[20]

---

[20] SA Reed testified that he interviewed Mr. Lopez again about a week after his interview with Mr. Dean. Tr. 124. On this occasion, defense counsel was present. Id. at 124-25. As it stands now, both defendants have confessed to robbing

AO 72A
(Rev.8/82)

## II. The Indictment and Superseding Indictment

On December 8, 2004, the Grand Jury returned an Indictment [5] solely against Mr. Lopez. Count One of that Indictment alleges that, on or about November 10, 2004, Mr. Lopez, took by force, violence, and intimidation from the persons or presence of another, approximately $3,600 in United States currency that was in the care, custody, and possession of AmSouth Bank, 3040 Martha Berry Highway, Rome, Georgia, a financial institution whose deposits were then insured by the Federal Deposit Insurance Corporation, and in so doing, assaulted any person and put in jeopardy the life of any person by the use of a dangerous weapon, that is, a firearm, all in violation of 18 U.S.C. § 2133(a) & (d). Count Two of that Indictment alleges that, during the crime alleged in Count One, Mr. Lopez did knowingly use, carry, possess, and discharge a firearm (i.e., pistol), in violation of 18 U.S.C. § 924(c)(1)(A)(iii).

Subsequently, on June 14, 2005, the grand jury returned a First Superseding Indictment [27] that added Mr. Dean.[21] Count One of that new Indictment charges

---

the AmSouth Bank, but the evidence shows that only one man entered the building. Id. at 129-30.

[21] This Superseding Indictment followed Mr. Dean's confession of his involvement in the bank robbery. See supra Part I.E.

AO 72A (Rev.8/82)

that, on November 10, 2004, defendants Lopez and Dean did conspire, combine, confederate, agree, and have a tacit understanding with one another to take and obtain personal property (i.e., United States currency) then in the custody and control of AmSouth Bank, a business operating in interstate commerce and which was part of an industry affecting commerce, from the persons of, and in the presence of, AmSouth Bank employees, against their will, by means of actual and threatened force, violence, and fear of injury, immediate and future, to the persons of those employees, and by doing said acts did unlawfully obstruct, delay, and interfere with commerce, as that term is defined in 18 U.S.C. § 1951, all of which was in violation of 18 U.S.C. § 1951(a). Count Two of that First Superseding Indictment [27] alleges that on November 10, 2004, defendants Lopez and Dean, aided and abetted by each other, during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, that is, the armed robbery charged in Court One, did knowingly use, carry and possess and discharge a firearm (i.e., a pistol), in violation of 18 U.S.C. § 924(c)(1)(A)(iii) and 2.[22]

[22] On August 3, 2005, the District Court granted the Government's Motion [38] to Dismiss the Indictment [5] returned solely against Mr. Lopez on December 8, 2004, given the filing of the First Superseding Indictment [27] against both defendants on June 14, 2005.

AO 72A
(Rev.8/82)

## III. Contentions of the Parties

Defendants Lopez and Dean filed a joint brief [58]. They contend that their Fourth Amendment rights were violated when police officers, who had concocted exigent circumstances, entered their duplex apartment without a warrant and seized Mr. Lopez. They argue that the fruits of the subsequent search of their duplex should be suppressed because the police had time to obtain a warrant before entering. The Government disagrees and responds in its brief [59] that the warrantless entry into the duplex was justified by exigent circumstances.

## IV. Analysis

Searches and seizures inside a home without a warrant are presumptively unreasonable. Payton v. New York, 445 U.S. 573, 586, 100 S. Ct. 1371, 1380 (1980). A warrantless entry requires both probable cause and exigent circumstances. United States v. Burgos, 720 F.2d 1520, 1525 (11th Cir. 1983); see also Kirk v. Louisiana, 536 U.S. 635, 638, 122 S. Ct. 2458, 2459 (2002) (per curiam) ("[P]olice officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home."). Although courts have catalogued several situations in which exigent circumstances exist (discussed infra), "the exception must

AO 72A
(Rev.8/82)

be applied carefully to each factual scenario." United States v. Lynch, 934 F.2d 1226, 1232 (11th Cir. 1991).

The general requirement that a search warrant be obtained is not lightly to be dispensed with; the burden is on those seeking an exemption from that requirement to show the need for it. Chimel v. California, 395 U.S. 752, 762, 89 S. Ct. 2034, 2039 (1969). "The exigency exception only applies when 'the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action.'" United States v. Santa, 236 F.3d 662, 669 (11th Cir. 2000) (quoting Burgos, 720 F.2d at 1526); see also United States v. Holloway, 290 F.3d 1331, 1334 (11th Cir. 2002) ("The exigent circumstances exception recognizes [that] a 'warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant.'" (quoting Michigan v. Tyler, 436 U.S. 499, 509, 98 S. Ct. 1942, 1949 (1978))).

Exigent circumstances encompass several common situations where resort to a magistrate judge for a search warrant is not feasible or advisable, such as danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, hot pursuit, and occurrence of an emergency situation. Holloway, 290 F.3d at 1334-37 (citing cases). "[T]he need to prevent destruction of

AO 72A
(Rev.8/82)

evidence increases where the nature of the evidence is such that it may be quickly and easily destroyed." United States v. Griffis, 746 F. Supp. 1326, 1330 (S.D. Ohio 1989) (currency).

"The test of whether exigent circumstances exist is an objective one. '[T]he appropriate inquiry is whether the facts . . . would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured.'" United States v. Tobin, 923 F.2d 1506, 1510 (11th Cir. 1991) (en banc) (alteration in original) (citation omitted) (quoting United States v. Rivera, 825 F.2d 152, 156 (7th Cir. 1987)). However, exigent circumstances do not exist where the suspects are unaware of police activity. United States v. Tovar-Rico, 61 F.3d 1529, 1535 (11th Cir. 1995). Moreover, exigent circumstances will not justify a warrantless entry if the exigency was created by the officers themselves. United States v. McGregor, 31 F.3d 1067, 1069 (11th Cir. 1994).

When a warrantless entry is based on exigent circumstances, the scope of the subsequent search must be limited to fulfill the purpose that justified the entry. Arizona v. Hicks, 480 U.S. 321, 325-26, 107 S. Ct. 1149, 1153 (1987). "An arrest within a home does not provide a license for the police to search the entire residence for evidence." United States v. Satterfield, 743 F.2d 827, 845 (11th Cir. 1984).

AO 72A
(Rev.8/82)

Thus, after officers secure a residence to ensure their safety and to prevent possible destruction of evidence, a subsequent search requires either a warrant or the defendant's voluntary consent. United States v. Sangineto-Miranda, 859 F.2d 1501, 1513 (6th Cir. 1988); Griffis, 746 F. Supp. at 1330.

On the basis of the evidence received at the hearing, the undersigned finds that the warrantless entry of the duplex was justified both by probable cause and exigent circumstances. Officers had located Mr. Dean in a parking lot across the street from the duplex as he was showing interest in a stolen vehicle that matched the description of one used as the getaway car in the AmSouth Bank robbery. Although he reported interest in the car's appearance[23] and claimed to be there to play basketball, Mr. Dean had no ball, and he was carrying a white cloth. When he reported that he lived across the street, officers quite naturally suspected that items of interest might be in that duplex. As they approached, officers saw someone moving inside the duplex. Given this undisputed observation, defendants' contention that no one inside the duplex even knew that police were outside is factually unsupported. Indeed, it is

[23] The Court agrees with the Government that a twenty-year-old male would likely not be interested in the appearance of a Taurus sedan. Gov't Br. [59] at 9 n.1. Such an assertion would likely arouse an officer's suspicion.

AO 72A
(Rev.8/82)

likely that the person inside the duplex saw what had happened to Mr. Dean and realized that the police had surrounded the residence.

When they looked in the duplex's window, both officers spotted a stack of banded cash, which could have been proceeds from a bank robbery.[24] Immediately after the officers realized that the money had been moved, Patrolman Adams exclaimed that he smelled something burning. Although Sergeant Lemming (who was standing nearby) did not smell anything burning, he confirmed that his colleague made such a statement. Fearing that the now missing cash was being destroyed by

[24] Although society generally respects a person's expectations of privacy in a dwelling, what a person chooses voluntarily to expose to public view loses its Fourth Amendment protection. See California v. Ciraolo, 476 U.S. 207, 213, 106 S. Ct. 1809, 1812-13 (1986). Generally, the police are free to observe whatever may be seen from a place where they are entitled to be. Florida v. Riley, 488 U.S. 445, 449, 109 S. Ct. 693, 696, (1989) (plurality opinion). Thus, the officers here committed no Fourth Amendment violation by looking in the duplex window from its front porch. See United States v. Vicknair, 610 F.2d 372, 377 (5th Cir. 1980) ("Police excursions onto private property have been upheld when designed to observe illegal acts through an unobstructed window . . . ."); see also United States v. Garcia, 997 F.2d 1273, 1279 (9th Cir. 1993) ("We have held that officers walking up to the front door of a house can look inside through a partially draped open window without conducting a Fourth Amendment search."); United States v. York, 895 F.2d 1026, 1029 (5th Cir. 1990) ("[O]ccupants who leave window curtains or blinds open expose themselves to the public's scrutiny of activities within that part of the house that can be seen from outside the premises. The police may look into that opening from any point in a public thoroughfare or sidewalk without engaging in a fourth amendment search . . . .").

AO 72A
(Rev.8/82)

someone possibly connected to the robbery, the officers made the decision to enter the duplex without awaiting a warrant.

Cash is an item that can easily be destroyed. See Griffis, 746 F. Supp. at 1330 (noting that "currency is of such a nature that it could be relatively quickly and easily destroyed"); see also United States v. Cognato, 408 F. Supp. 1000, 1004 (D. Conn.) (exigent circumstances included fact that cash from bank robbery could be flushed down toilet or burned), aff'd mem., 539 F.2d 703 (2d Cir. 1976). The officers had to act quickly to prevent what they reasonably believed was occurring. Even the short delay occasioned by obtaining a warrant could have resulted in loss of the evidence.

The Court finds credible Patrolman Adams's assertion that he smelled something burning. It matters not that Sergeant Lemming's olfactories failed to detect such a scent or that, after the fact, it appears that no fire had been started inside the duplex. As noted above, the test to determine whether exigent circumstances exist is an objective one, based on the facts faced by the officers and not viewed in the relative calm of hindsight. The undersigned finds that the officers did not fabricate the existence of exigent circumstances or create the exigency through their actions. Instead, the facts produced at the hearing would lead



AO 72A
(Rev.8/82)

reasonable, experienced officers to believe that evidence might be destroyed before a warrant could be secured. Thus, given the existence of probable cause to believe that cash from the bank robbery was inside the duplex, given that the person inside the duplex may have been the armed bank robber, and given the reasonable belief that once visible evidence was being destroyed, exigent circumstances necessary to allow entry without a warrant existed. Therefore, the Motions to Suppress Evidence should be denied.

## V. Conclusion

For the reasons stated above, the undersigned **RECOMMENDS** that defendants' Motions to Suppress Evidence [35, 49] be **DENIED**. The Clerk is further **DIRECTED** to terminate defendants' Jackson-Denno Motions [48, 50].

**SO RECOMMENDED**, this 7th day of February, 2006.

/s/
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | CRIMINAL ACTION FILE |
| v. | NO. 4:04-CR-72-HLM |
| RICARDO CURTIS LOPEZ and CHRISTOPHER MICHAEL DEAN, | |
| Defendants. | |

**ORDER FOR SERVICE OF**
**NON-FINAL REPORT AND RECOMMENDATION**

Let this Non-Final Report and Recommendation of the United States Magistrate Judge, made in accordance with 28 U.S.C. § 636(b)(1)(B) and the Court's Local Criminal Rule 58.1(A)(3)(a), be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Non-Final Report and Recommendation within ten days of the receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to any transcripts if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing

for review by the District Court. If no objections are filed, the Non-Final Report and Recommendation may be adopted as the opinion and order of the District Court, and any appellate review of factual findings will be limited to a plain error review. United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983) (per curiam).

The Clerk is directed to submit the Non-Final Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**SO ORDERED**, this 7th day of February, 2006.

/s/
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)